UGORJI ONYEANI,                    )
                                   )
          Plaintiff,               )        No. 15 C 05917
                                   )
     v.                            )
                                   )        Judge Edmond E. Chang
UNITED STATES OF AMERICA,          )
                                   )
          Defendant.               )

## MEMORANDUM OPINION AND ORDER

Ugorji Onyeani brings this action to review a May 2015 determination by the Internal Revenue Service that he owes $289,043.08 in individual income tax for the 2015 tax year.[1] The IRS assessed this tax—called a termination assessment—before the tax was even due, under a statute authorizing it to act when it believes that a taxpayer is obstructing the agency's ability to collect taxes for the current (or prior) tax year. The IRS believed that Onyeani was attempting to conceal his income; he had attempted to transfer hundreds of thousands of dollars abroad, and despite having over $800,000 in his bank accounts, Onyeani had reported no income for the last several years. For his part, Onyeani argues that the money in his accounts came from his legitimate crude-oil business. In June 2015, Onyeani filed an administrative appeal, which was still pending when he filed this district court action on July 6, 2015. The Court then scheduled an evidentiary hearing, which was delayed until March 2016 so that Onyeani could recover from a serious medical

---

[1] The Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1331 and 26 U.S.C. § 7429(b).

condition. Now, after considering the parties' briefs and evidence submitted at the hearing, the Court upholds the IRS's determination, finding that the tax assessment was reasonable and that the amount assessed was appropriate.

## I. Background

Ugorji Timothy Wilson Onyeani was born in Nigeria and became a citizen of the United Kingdom, where he practiced medicine for five years. Pl.'s Exh. 2, Passport.[2] In 2008 and 2009, Onyeani began visiting the United States for holidays and to see friends and family. He moved to the United States in 2010, becoming a permanent resident in May 2012. Pl.'s Exh. 3, Permanent Resident Card at 1. Onyeani hoped to take licensing exams in the United States to continue his career in medicine, but he also hoped to pursue graduate studies in business. Shortly after moving to the United States, Onyeani enrolled in an MBA program at DeVry University. Pl.'s Exh. 4, DeVry Tr. After graduating from DeVry in 2015, *id.*, Onyeani was accepted into a doctorate business program at Argosy University, Pl.'s Exh. 5, Argosy Ltr. During this time, Onyeani lived in Illinois (although possibly in other states as well), and most recently at 2211 Crabtree Lane in Algonquin, Illinois (this home address will be relevant to the crude-oil business, as noted later). *E.g.*, DeVry Tr.; Argosy Ltr.; Def.'s Exh. 40, BMO Harris Records (Onyeani) at 1.

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The exhibits ("Pl.'s Exh." and "Def.'s Exh.") refer to exhibits that were introduced at the evidentiary hearing on March 17-18, 2016.

Some of the cited facts also come from testimony presented at the evidentiary hearing; because neither party has ordered or submitted a transcript, however, the Court does not cite to the specific transcript.

While Onyeani was a student, he and his wife, Rosa Paulino, filed individual federal income tax returns for tax years 2011, 2012, and 2013. Def.'s Exh. 7, 2011 Tax Return; Def.'s Exh. 9, 2012 Tax Return; Def.'s Exh. 12, 2013 Tax Return. In those years, Onyeani and Paulino reported income of $24,187, $32,242, and $31,864. *Id.* All of this income was from Paulino's job at Aramark Food Services and none of the income was attributable to Onyeani. *Id.* But in March 2013, Onyeani submitted an application to Wells Fargo to finance the purchase of a Mercedes; he listed on the application that he had an annual salary of $150,000 from "American Hope Istitute [sic]," of which he was the president. Def.'s Exh. 45, Wells Fargo Loan at 6. He also submitted what appeared to be paystubs from a corporation called Calgary, Inc. (more on this later), showing total monthly net pay of $12,705.78. *Id.* at 15.

The parties dispute whether Onyeani filed a tax return for the 2014 tax year. The IRS contends that it has no tax records for him for that year, Def.'s Exh. 13, 2014 Lack of Record Certification, although Paulino did file a married-filing-separately return without Onyeani, Def.'s Exh. 51, 2014 Tax Return (Paulino). Onyeani testified that he did file a 2014 tax return even though he had no income, but he never offered into evidence a copy of the purported return.

## A. Onyeani's Business Ventures

Onyeani testified that business school opened up a new world to him and inspired him to get involved in business. According to Onyeani, his first business was called Calgary, Inc. This company had a number of DBAs ("doing business as" names, which are different from the officially registered name), including "Omega

Health Care Technical School." Onyeani later changed the company's name to American Hope Institute. Calgary, Inc./Omega/American Hope Institute was a nursing school that failed due to problems with state regulations.

At some point, Onyeani also began reaching out to contacts in the Nigerian crude-oil business. Onyeani testified that after traveling to Nigeria to learn more about the oil business, he decided to start his own ventures in the United States. In 2015, he registered two Illinois businesses: American Hope Petroleum and Energy Corporation (AHPE Corp.) and American Hope Commodity Exchange Corporation (AHCE Corp.). The Illinois Secretary of State website shows that AHPE Corp. was incorporated in January 2015, with Ugorji Onyeani as the registered agent at the residential address of 2211 Crabtree Lane in Algonquin, Illinois. Def.'s Exh. 39, BMO Harris Records (AHPE Corp.) at 4. And AHCE Corp. was incorporated in February 2015, with Wilson Onyeani as the registered agent at the same Algonquin address. Def.'s Exh. 41, BMO Harris Records (AHCE Corp.) at 8. Internal IRS records (which the agency calls "transcripts") from IRS databases similarly list Onyeani's Algonquin address as the business address for these two corporations, and also show that the two businesses registered employer identification numbers (EINs) with the IRS. (The IRS uses EINs to identify a business entity.) Def.'s Exh. 20, IRS Transcript (AHPE Corp.); Def.'s Exh. 21, IRS Transcript (AHCE Corp.). The transcripts also confirm that AHPE Corp. was formed in January 2015 and that AHCE Corp. was formed in February 2015. *Id.*

The IRS records also link Onyeani to a third entity: Calgary Healthcare Group (Calgary Healthcare), a partnership that was formed in December 2013. Def.'s Exh. 15, IRS Transcript (Calgary/AHPE). That partnership had a second associated name: American Hope Petroleum and Energy (AHPE Partnership). *Id.* The transcript lists "Ugorji Onyeani MD MBR" and an address of 2483 2nd Street E in Eagle Pass, Texas. *Id.* But Onyeani disputes any connection to Calgary Healthcare. According to him, Calgary Healthcare was a business that his friend and former business partner, Remigius Okea, wanted to start together. But Onyeani testified that after he and Okea had a falling out, he was no longer involved in the business.

Sometime while establishing these businesses, Onyeani opened a checking account at PNC Bank. Onyeani testified that PNC did not do business with oil and gas companies, so he moved his accounts to Bank of America. It is unclear when he opened a Bank of America account, but between January and March 2015, he received several large deposits totaling over $700,000 in that account. Onyeani argues that he was conducting legitimate crude-oil deals, and that these deposits were from investors and buyers. For example, in January 2015, an individual named Avis LaVelle wrote a check for $42,000 to "Professor U.T. W. Onyeani" with the memo "on behalf of strategic oil procurement and development." Def.'s Exh. 43, LaVelle Check; Pl.'s Exh. 16, Lavelle Aff. ¶ 3. LaVelle and Onyeani signed a January 15, 2015 promissory note where Onyeani promised to repay LaVelle "within the 2015 calendar year or as soon as the first transaction AHPE concludes,

whichever occurs first." Def.'s Exh. 44, LaVelle Promissory Note. In addition, a corporation called LaSalle International wired money to Onyeani's Bank of America account for investments and/or crude-oil purchases, including $20,000 on February 3, 2015 and $520,000 on March 3, 2015. Pl.'s Exh. 11, BOA Records at 1, 3. LaSalle also wrote Onyeani a February 4, 2015 check for $5,000. Def.'s Exh. 37, Kaplan Ltr. at 4; BOA Records at 1 (showing a $5,000 "counter credit" on February 4, 2015). Onyeani also testified that on March 5, 2015, a Chinese corporation called Tianjin Commodity Exchange wired $199,985 to buy crude oil. BOA Records at 1; Pl.'s Exh. 15, Lu Aff. ¶¶ 3-4.

As part of the oil deal, Pierre Yenokian, the president of LaSalle, testified that Onyeani instructed him to send $200,000 to a company called Trevo. On March 10, 2015, the user "wonyeani16@gmail.com" sent Yenokian an email with the subject "WELLS FARGO LOGISTICS ACCOUNT." Kaplan Ltr. at 12. The body of the email included bank account information for Trevo LLC, listing an address in Oklahoma City. *Id.* Yenokian testified that after speaking with Onyeani on the phone, Yenokian was led to believe that Trevo was a logistical handling company for the Nigerian State Oil Company. Based on Onyeani's representations, LaSalle wrote Trevo a $200,000 check on March 10, adding "NNPC Logistics" to the memo line. *Id.* at 12-14. The check was deposited on the same day into a Wells Fargo checking account, but the depositor's identity is unknown because the deposit slip is unsigned. *Id.* As it turns out, Trevo's website, which also lists an Oklahoma City location, shows that the company has nothing to do with oil; it is actually a

distributor of nutritional products that customers can purchase at wholesale. Def.'s Exh. 38, Trevo Website at 2, 7. Onyeani, for his part, denies that he ever told Yenokian to send money to Trevo.

Onyeani admits that sometime in March 2015, he attempted to wire $300,000 to a bank account in London; this transaction was also supposedly part of the crude-oil deal. Onyeani testified that the money was going to a company called Supply Source, which tests the quality of crude oil. But Bank of America stopped this transaction and told Onyeani that it was freezing his funds and investigating his accounts. On March 30, 2015, Onyeani went to a bank branch, where he was interviewed by law enforcement. He was ultimately allowed to close his Bank of America account and withdraw all of his funds, which totaled over $700,000, in cashier's checks. BOA Records at 1 (showing 3/30/15 withdrawal of $721,385).

That same day, Onyeani opened three bank accounts at BMO Harris Bank: a personal account in the name of Ugorji Timothy Wilson Onyeani, a business account for AHPE Corp., and a second business account for AHCE Corp. BMO Harris Records (Onyeani); BMO Harris Records (AHPE Corp.); BMO Harris Records (AHCE Corp.). Onyeani alone had signature authority over all three accounts. *Id.* Onyeani deposited $743,760.71 into the AHPE Corp. account, consisting of three Bank of America cashier's checks of $721,385.00, $22,056.21, and $319.50. BMO Harris Records (AHPE Corp.) at 22-24. He also deposited $11 into his AHCE Corp. business account, BMO Harris Records (AHCE Corp.) at 32, and $63,002.05 in his

personal account, BMO Harris Records (Onyeani) at 15-16, both in cashier's checks from Bank of America.

Shortly thereafter, George Quiroga, an investigator and vice president at BMO Harris, received a phone call from Detective Finnegan of the Chicago Police Department's financial crimes unit. Finnegan told Quiroga that the Secret Service and Chicago police department were investigating Onyeani, and that they found BMO Harris receipts for large deposits during a search of Onyeani's home. Finnegan also told Quiroga that Bank of America had closed Onyeani's account due to concerns about the source of Onyeani's funds. After speaking with Finnegan, BMO Harris froze Onyeani's accounts so that it could conduct its own investigation. In April 2015, BMO Harris received a "fraud finder alert" from a third-party provider, confirming that Bank of America had closed Onyeani's accounts for suspected fraud. Sometime during the investigation, Quiroga also received a phone call from Okea, who said that he was an executive of Onyeani's companies and asked for information about Onyeani's bank accounts. Quiroga could not give out any information because Okea was not a customer.

Eventually, in April or May 2015, Quiroga met with Onyeani at the BMO Harris branch in Algonquin. According to Quiroga, Onyeani said that he was in the energy business and that his company purchased oil and gas for buyers. Onyeani also explained that he had previously attempted to send money overseas because his business was going global and soon expanding to London. According to Quiroga,

Onyeani said that he had left Bank of America because he was dissatisfied with the service there. Onyeani denies giving this version of events to Quiroga.

## C. IRS Investigation

Around May 2015, the IRS tasked Matt Kron, a revenue agent, to evaluate a potential tax assessment on Onyeani. Both the Secret Service and the IRS Criminal Investigation Division told Kron that Onyeani had previously tried to send $300,000 overseas to a London bank account, but that this transfer was unsuccessful. Kron then called Quiroga, who confirmed this information. Quiroga also informed Kron that Onyeani was planning to expand his company overseas, but that Onyeani's Bank of America accounts had been flagged for fraud. Examining bank records and past returns, Kron learned that Onyeani had over $800,000 in his BMO Harris bank accounts but that Onyeani had not reported any income to the IRS since arriving in the United States. In addition, while examining IRS transcripts, Kron discovered that Onyeani was associated with Calgary Healthcare/AHPE Partnership, which had not filed any partnership tax returns since it was established in December 2013. IRS Transcript (Calgary/AHPE). Onyeani was also connected to two additional companies: AHPE Corp. and AHCE Corp. IRS Transcript (AHPE Corp.); IRS Transcript (AHCE Corp.). Finally, Kron searched through public records, where he found a website for American Hope Petroleum and Energy (located at http://hopepetroleum.com/) describing the entity as "an independent crude oil purchasing and selling broker." Def.'s Exh. 33, AHPE Website at 3. Kron noticed that while the website initially looked complete, many of the

pages were actually empty, stating "more to come." *Id.* at 7-16, 33-56. The website also stated that American Hope Petroleum and Energy was located in Eagle Pass, Texas, *id.* at 19, which was the same location listed on the IRS transcripts for Calgary Healthcare/AHPE Partnership that was registered in Onyeani's name, IRS Transcript (Calgary/AHPE). In his public records search, Kron also found books authored by Onyeani entitled *A Practical Guide to Buying and Selling Nigerian Crude Oil: Sellers and Buyers Handbook*, and various medical books describing him as affiliated with "American Hope Institute" and "Calgary Healthcare Group." Def.'s Exh. 28, Amazon Records; Def.'s Exh. 29, Book Covers.

Based on the above information, Kron determined that the funds in Onyeani's accounts were taxable income and notified Onyeani of a $288,546 termination assessment on May 14, 2015. Def.'s Exh. 1, Notice of Assessment. The IRS determined this amount by adding up the balances in Onyeani's three BMO Harris accounts totaling $802,083.00 at the time, taking a standard deduction of $6,200, and applying the married-filing-separate tax rates. *Id.* at 3. On May 13, 2015, the IRS also issued a notice of levy to Onyeani and sent the notice to BMO Harris. Def.'s Exh. 2, Notice of Levy. The levy also included $497.08 in interest, for a total amount due of $289,043.08. *Id.* at 2. To comply with the levy, BMO Harris withdrew the requested amount from Onyeani's accounts and held the funds in a separate account, where they continue to sit. BMO Harris then decided to close Onyeani's accounts and returned the remaining funds (around $500,000) to Onyeani.

On July 9, 2015, Jerry Kaplan, counsel for LaSalle International, sent the IRS a letter, explaining that it was investigating whether Onyeani had fraudulently induced LaSalle to pay $2,045,000 for oil that was never delivered. Kaplan Ltr. at 1-2. Kaplan asserted that LaSalle was entitled to $545,000 of the funds in Onyeani's frozen accounts, but LaSalle did not actually make a wrongful levy claim, which is a claim of ownership to money by someone other than the taxpayer. 26 U.S.C. § 6343(b). Instead, LaSalle simply "request[ed] that the IRS not release its hold on any of the moneys … unless and until we have intervened in the case … to prevent Mr. Olyeani [sic] from immediately absconding with his ill gotten gains." *Id.* at 2. Yenokian testified that LaSalle ultimately reached a private settlement with Onyeani about the disputed funds.

On June 11, 2015, Onyeani sought administrative review of the termination assessment. Def.'s Exh. 35, Assessment Appeal. But before the IRS ever made a final determination, Onyeani filed this action for judicial review on July 6, 2015.[3] R.

---

[3]The IRS does not argue that Onyeani failed to exhaust his administrative remedies. Section 7429 provides that the taxpayer may seek judicial review in the district court "after the earlier of − (A) the day the Secretary notifies the taxpayer of the Secretary's determination described in subsection (a)(3), or (B) the 16th day after the request described in subsection (a)(2) was made." 26 U.S.C. § 7429(b)(1). Subsection (a)(3) refers to the IRS Secretary's final determination, which was never completed in this case. And subsection (a)(2) governs the request for administrative review, which Onyeani made on June 11, 2015. Assessment Appeal.

Because exhaustion of administrative remedies is generally an affirmative defense and not a jurisdictional prerequisite, the IRS waived this argument and the Court may review Onyeani's case. *See Volovsek v. Wisconsin Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 687 (7th Cir. 2003) ("[T]he requirement that a plaintiff exhaust her administrative remedies … is merely a condition precedent to suit, not a jurisdictional requirement … . Therefore, the timing and scope requirements of an [agency] filing are subject to various equitable doctrines—most significantly in the present case, waiver." (citations omitted)). Although the Seventh Circuit has not ruled on the jurisdictional quality of § 7429, the Sixth Circuit has concluded that "[Section] 7429's exhaustion

1, Compl. The Court originally set an evidentiary hearing date for August 2015, but Onyeani suffered an unexpected medical emergency that delayed the hearing. R. 27. The hearing was ultimately held on March 17-18, 2016. R. 39.

## II. Legal Standard

26 U.S.C. § 6851 allows the IRS to issue a termination assessment when it "finds that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act … tending to prejudice" collection of income taxes. 26 U.S.C. § 6851(a)(1). The IRS "shall immediately make a determination of tax for the current taxable year or for the preceding taxable year … and … such tax shall become immediately due and payable." *Id.*; *see also Comm'r of Internal Revenue v. Hendrickson*, 873 F.2d 1018, 1020 (7th Cir. 1989) (When the IRS "believes that a taxpayer intends to … thwart efforts to collect taxes due from him, it can make an immediate determination of his tax liability—that is, without waiting until the end of the taxpayer's tax year—and demand immediate payment of the taxes due."). A termination assessment is similar to a "jeopardy assessment," which expedites payments of past due taxes. *Id.* Put another way, "[t]he difference between the two types of assessment is merely that [a termination assessment] comes into play

---

requirement lacks jurisdictional pedigree" because it includes no "clear statement" of jurisdiction. *Abraitis v. United States*, 709 F.3d 641, 644-45 (6th Cir. 2013); *see also Galvez v. I.R.S.*, 448 F. App'x 880, 888 (11th Cir. 2011) ("[T]he language of § 7429(b) is not explicitly jurisdictional," and "Congress must 'clearly state[] that a threshold limitation on a statute's scope shall count as jurisdictional.'" (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006))). *But see Wapnick v. United States*, 112 F.3d 74 (2d Cir. 1997) (plaintiff, who did not request administrative review of his tax assessment, "failed to meet the jurisdictional requirements of 26 U.S.C. § 7429(b)").

before the taxpayer's tax return is due, and [a jeopardy assessment] after." *Id.* at 1020-21.

After the IRS makes a termination assessment, the taxpayer can seek administrative review within thirty days of receiving written notice. 26 U.S.C. § 7429(a)(2) ("Within 30 days after the day on which the taxpayer is furnished the written statement [of the assessment] … the taxpayer may request the Secretary to review the action taken."). And if that review is unfavorable, she can petition the district court for expedited review to determine the reasonableness of the IRS's action. 26 U.S.C. § 7429(b)(1) ("[T]he taxpayer may bring a civil action against the United States for a determination under this subsection … ."). Judicial review generally should be completed within twenty days, 26 U.S.C. § 7429(b)(3), but the deadline is "only a strong admonition for the judiciary to act expeditiously" and not "a limitation on the lower courts' jurisdiction." *Hiley v. United States*, 807 F.2d 623, 627 n.7 (7th Cir. 1986) (citing *Meadows v. United States*, 665 F.2d 1009 (11th Cir. 1982); *United States v. Doyle*, 660 F.2d 277 (7th Cir. 1981)).

Section 7429 spells out the two questions that the reviewing court must answer: (1) whether the assessment was reasonable under the circumstances; and (2) whether the amount assessed is appropriate under the circumstances. 26 U.S.C. § 7429(b)(3)(A); *e.g.*, *Hiley*, 807 F.2d at 627; *Wellek v. United States*, 324 F. Supp. 2d 905, 911 (N.D. Ill. 2004). The government bears the burden of proving that the assessment was reasonable, and the taxpayer bears the burden of proving that the amount assessed was inappropriate. 26 U.S.C. § 7429(g). Review is *de novo*, without

deferring to the IRS's determination of reasonableness. *Wellek*, 324 F. Supp. 2d at 911. And the determination is "unrelated, substantively and procedurally, to any subsequent proceeding to determine the correct tax liability." *Id.* (citation and quotations omitted). That means "the district court should not review the assessment and levy as a trial on the ultimate merits of the tax liabilities." *Id.* (citation omitted).

The other limitation on judicial review is that a Section 7429 hearing is a summary proceeding, which means that the district court's determination "shall be final and conclusive and shall not be reviewed by any other court." 26 U.S.C. § 7429(f). Although the appellate court may not review the merits of the decision, it may review "whether the district court acted within the scope of its statutory authority." *Hiley*, 807 F.2d at 627 (reviewing whether the district court properly dismissed a Section 7429 action on procedural grounds); *see also Thompson v. United States*, 445 F. App'x 878, 880 (7th Cir. 2011) ("limit[ing] [the] review to considering only whether the district court exceeded its authority by ruling on [the plaintiff's] complaint more than 20 days after he filed it"). And because the proceeding is summary, evidence need not conform to the Federal Rules of Evidence. *See Wellek*, 324 F. Supp. 2d at 911 (citing *Magluta v. United States*, 952 F. Supp. 798, 801 (S.D. Fla. 1996)); *Evans v. United States*, 672 F. Supp. 1118, 1123 (S.D. Ind. 1987) ("Hearsay evidence is admissible because of the summary nature of the proceedings which makes the rules of evidence inapplicable."); *Strauser v. United States*, 535 F. Supp. 957, 958-59 (N.D. Ill. 1982) (The IRS "can rely upon

'information' that need not comport with the strict rules of evidence," and "[b]y the same token Section 7429(b)(2) requires the Court to review the [same] 'information[.]'" (citations omitted)). Finally, in determining whether the assessment was reasonable, the Court may consider facts known at the time the IRS made the assessment as well as information discovered after. *Wellek*, 324 F. Supp. 2d at 911 (citing *Loretto v. United States*, 440 F. Supp. 1168, 1173 (E.D. Pa. 1977)).

## III. Analysis

### A. Reasonableness of the Assessment

The government bears the burden on the first question—whether the assessment was reasonable under the circumstances. 26 U.S.C. § 7429(g)(1); *Hiley*, 807 F.2d at 627. The evidentiary standard required to meet this burden is both low and broad—that is, "something more than 'not arbitrary and capricious' and something less than 'supported by substantial evidence.'" *Evans*, 672 F. Supp. at 1123 (quoting *Loretto*, 440 F. Supp. at 1172). The IRS "only needs to prove that the circumstances *appear* to jeopardize collection," and not that the taxpayer *is actually jeopardizing* collection. *Wellek*, 324 F. Supp. 2d at 912 (emphasis in original) (citations omitted).

The factors used to evaluate reasonableness come from the text of 26 U.S.C. § 6851. Courts look to whether

> (1) the taxpayer is or appears to be planning to quickly depart from the United States to conceal himself; (2) the taxpayer is or appears to be designing to place his property beyond the reach of the government either by removing it from the United States or by concealing it, by

transferring it to other persons, or by dissipating it; or (3) the taxpayer's financial solvency appears to be imperiled.

*Thompson v. United States*, 2010 WL 3893806, at *5 (N.D. Ill. Sept. 29, 2010) *aff'd*, 445 F. App'x 878 (7th Cir. 2011) (citing *Wellek*, 324 F. Supp. 2d at 912); *Caparaso v. United States*, 1990 WL 87123, at *1 (N.D. Ind. May 17, 1990) (same); 26 U.S.C. § 6851(a). In addition to the factors derived from the statutory text, "courts may and should consider any other appropriate factors." *Wellek*, 324 F. Supp. at 912 (citation omitted). For example, a taxpayer's involvement in criminal activity is relevant and may suggest that the taxpayer "had and would continue to conceal his assets." *Thompson*, 2010 WL 3893806, at *5 (citations and quotations omitted). Other appropriate factors include a taxpayer's "erratic fiscal behavior," such as prior tax returns indicating little or no income despite possessing large amounts of cash, dissipation of assets, or other behavior making it difficult to locate the taxpayer or her assets. *Wellek*, 324 F. Supp. at 912 (citation omitted).

In this case, the Court concludes that the IRS's determination was reasonable because Onyeani appeared to be perpetuating a fraud by collecting money for a crude-oil brokering business that did not really exist. The IRS could reasonably have believed that rather than using investor and customer funds for legitimate business purposes, Onyeani was planning to conceal the money, remove it from the United States, transfer it to others, spend it, or otherwise dissipate it.[4] Supporting

---

[4]The IRS may assess taxes on income that was obtained by fraud or other illegal behavior. The Internal Revenue Code broadly defines income as "all income *from whatever source derived*." 28 U.S.C. § 61(a) (emphasis added); *see also United States v. Sullivan*, 274 U.S. 259, 263 (1927) ("We see no reason … why the fact that a business is unlawful should exempt it from paying the taxes that if lawful it would have to pay."); *United States v. Ytem*,

this conclusion are the suspicious circumstances surrounding Onyeani's businesses. Although Onyeani asserts that he deals crude oil, the evidence reveals few legal, regulatory, contractual, or other business-related documents that an international business—especially one preparing to deal millions of barrels of oil per month—must surely maintain. The documents that do exist raise even more questions. For example, at the beginning of 2015, Onyeani allegedly began pursuing his first major oil deal. A "sales purchase agreement/commercial invoice" stated that the buyer, LaSalle, would purchase 2 million barrels of oil a month at $56/barrel. Assessment Appeal at 20 ¶¶ 1-3. If successful, the contract would be extended for a year, for a total deal worth over one *billion* dollars. *Id.* ¶ 8. But the "sales purchase agreement" is not even signed by the buyer, and the document is itself full of inconsistencies. *Id.* One page of the contract lists a discount of $5 per barrel, *id.* at 17, while another page lists a $4 per barrel discount, *id.* at 20 ¶ 12. It is hard to imagine that an oil trading company could afford to make an error costing $2 million a month, or $24 million a year. Onyeani also points to several documents, written in Chinese, that purport to be an oil contract with Tianjin. *Id.* at 37-39. But Onyeani never had these documents translated (or, at least, he did not introduce any translation), nor was there evidence that Onyeani spoke Chinese, so the Court has no solid idea of what these documents really are. If anything, they raise questions as to how Onyeani could make a deal based on documents that he could not read.

---

255 F.3d 394, 397 (7th Cir. 2001) ("Furthermore, the fact that illegal income is taxable is widely known, even among lay people."); *Thompson*, 2010 WL 3893806, at *6 (counting over $300,000 seized by the FBI as income in a jeopardy assessment, even when the money was likely from drugs sales).

In addition, Onyeani testified that as part of his crude oil deal, he tried to transfer around $300,000 from his Bank of America account to Supply Source, a London company that tests the quality of crude oil. R. 24, Pl.'s Resp. at 4. Onyeani explained that this testing was necessary to make sure that the oil adhered to international standards. Supply Source had a London address tied to a London Barclays bank account. Kaplan Ltr. at 10. But curiously, there is not a single contract with Supply Source for this service. Nor are there any emails, phone logs, or other evidence of communications with Supply Source about this transaction. The Supply Source transfer is even more suspicious given that in June and July 2010, Onyeani received wire transfers of more than $200,000 from a Barclays bank account in London. Def.'s Exh. 49, Chase Records (3905) at 74 (showing a $112,214 wire on June 29 and a $104,335 wire on July 2). To be sure, this may be no more than a coincidence, as it does not conclusively show that Onyeani was somehow tied to Supply Source. But the transfers, along with the absence of documentation about the purported $300,000 transaction, raise suspicion as to the legitimacy of this deal.

The crude-oil deal with LaSalle also involved other suspicious parties. Yenokian (remember, he was the president of LaSalle) testified that he was instructed to send money to a company called Trevo as part of the oil transaction. On March 10, 2015, a person with the address "wonyeani16@gmail.com" emailed Yenokian about the "WELLS FARGO LOGISTICS ACCOUNT." Kaplan Ltr. at 12. The body of the email included bank account information for Trevo LLC, listing an address in Oklahoma City. *Id*. Yenokian testified that after speaking to Onyeani on

the phone, Yenokian was led to believe that Trevo was a logistics company for the Nigerian State Oil Company. So on this belief, Yenokian wrote a $200,000 check to Trevo on March 10, 2015. *Id.* But Trevo's website, which also lists an Oklahoma City location, shows that it is completely unrelated to the oil and gas industry; it is actually a distributor of nutritional products that customers can purchase for wholesale. Trevo Website at 2, 7. A purchaser of Trevo products can earn bonuses and commissions by selling the products to others; the website promises up to 40% in commissions and 25-40% retail profit. *Id.* at 7-8, 10. Trevo seems like a get-rich-quick scheme—the website dedicates most of its real estate to convincing customers that its "single-line matrix" compensation scheme provides "an unprecedented opportunity to be a part of and profit from a billion dollar brand," yet very little space describing its nutritional products. *Id.* at 5-6. But even if the company is legitimate, it still has nothing to do with the crude-oil industry. For his part, Onyeani disputes having any connection to Trevo. It is also curious that Yenokian, as the president of an international energy company, did not do his due diligence before sending an unknown company a $200,000 check. A simple web search would have quickly revealed that Trevo is a (possibly sham) nutritional products company. In addition, at the evidentiary hearing, Onyeani also argued that the email he allegedly sent to Yenokian is a forgery, pointing to the font difference between the email header and the body. Kaplan Ltr. at 12. Looking at this email, it also seems odd (but not impossible) that Yenokian received it at 2:01 p.m. on March 10 and then immediately wrote Trevo a check that was cashed—in person—an hour later

at 3:06 p.m. Kaplan Ltr. at 12-14. Perhaps there is more to this story and Yenokian was an accomplice, and not a victim of Onyeani's business dealings. But the Court is not called on to make factual determinations on Yenokian's role or whether the email is genuine. The Court's only duty is to determine whether the evidence—meeting a low evidentiary burden—shows that Onyeani *appeared* to be jeopardizing tax collection. And the evidence at this stage shows that it was reasonable for the IRS to believe that Onyeani seemed to be directing investor money into a possibly sham business that was entirely unrelated to crude oil.

What's more, the IRS rightly points out that the entities affiliated with Onyeani do not show signs of normal business operations. It is true that AHPE Corp. and AHCE Corp. were created in early 2015, so they had only existed for five months at the time the IRS made the assessment. Yet the bank accounts show little evidence of corporate activity and reveal no expenses that a fully operational company—one that is on the cusp of a billion dollar deal—would be expected to have. Instead, the accounts only contain a handful of transactions, many of which were the initial deposits from Bank of America cashier's checks. BMO Harris Records (AHPE Corp.); BMO Harris Records (AHCE Corp.). In addition, Calgary Healthcare, also known as AHPE Partnership, had been relatively inactive since its formation in December 2013. Its website, which appears to be legitimate at first glance, is largely empty, with many blank pages labeled "more to come." *See* AHPE Website at 7-16, 33-56. And the seemingly complete pages actually just repeat the

same few paragraphs. *Id.* at 5, 19, 21, 23, 25, 27, 29, 31. The unfinished website adds doubt to whether the business was truly operational.

Onyeani, however, testified that he was no longer affiliated with Calgary Healthcare/AHPE Partnership after he had a falling out with Okea, his former business partner. But the IRS could have reasonably concluded otherwise. For one, the logo on the Calgary Healthcare/AHPE Partnership website is very similar to the logo used on Onyeani's oil deal documents, including a February 22, 2015 letter from "Professor Wilson U Timothy-Onyeani" to the Nigerian National Petroleum Corporation purporting to confirm that Onyeani was "wiling & abel [sic] to remit, $5,000,000.00" for the crude oil deal. Kaplan Ltr. at 70. The logo on both the website and letter is a picture of a flame and a gear next to the words "AHPE" and "American Hope Petroleum & Energy." *Id.* True, the fonts are slightly different, and the letterhead logo adds the words "Global Resources," but on the whole, they are very similar:





AHPE Website; Kaplan Ltr. at 70. In addition, the IRS's internal transcript for Calgary Healthcare/AHPE Partnership lists "Uzorji Onyeani MD MBR" along with an Eagle Pass address in Texas, IRS Transcript (Calgary/AHPE), which is the same

address located on the AHPE website, AHPE Website at 19. On top of the logo, name, and address similarities, in June 2014, Onyeani and Okea jointly opened a Wells Fargo business account for Calgary Healthcare Group, LLC/American Hope Petroleum and Energy. Def.'s Exh. 46, Wells Fargo Records at 99, 137. This account had an address of 2483 2nd Street E in Eagle Pass, Texas—the same address on the website and on the IRS transcripts—and was still open as of October 2015. *Id.* at 198. And finally, Quiroga testified that Okea had called BMO Harris sometime during the bank's investigation, identifying himself as an executive of Onyeani's business. Again, the Court is not definitively concluding that Onyeani was actively involved in Calgary Healthcare/AHPE Partnership, nor is the Court saying that Onyeani and Okea's relationship did not sour. But this evidence does allow the IRS to reasonably conclude that Onyeani had some affiliation with the partnership, whose incomplete website and lack of normal business activity was another sign of the dubious nature of Onyeani's crude-oil business.

Finally, Onyeani's "erratic fiscal behavior," in which he possessed large amounts of cash yet reported no income since his 2010 arrival to the United States, also supports the IRS's determination. Onyeani testified that he had never made any money from his crude-oil business. For his day-to-day expenses, he relied on money he saved in the UK and gifts from family and friends in Nigeria. Indeed, Onyeani's bank records do show large international wire transfers from the UK and from Nigeria. Chase Records (3905) at 74 (6/29/10 and 7/2/10 deposits of $112,214 and $104,335 from Barclays in the UK); 173 (5/31/12 and 6/5/12 deposits of $8,975

and $9,000 from Citibank in Nigeria); 231 (9/23/13 deposit of $9,000 from Deutsche Bank in Nigeria). But in March 2013, Onyeani submitted an application to Wells Fargo to finance the purchase of a Mercedes, listing an annual salary of $150,000 from "American Hope Istitute [sic]," of which he was the president. Wells Fargo Loan at 6. He also submitted what appeared to be paystubs from Calgary, Inc., showing total monthly gross pay of $20,833.33 and monthly net pay of $12,705.78 in early 2013. *Id.* at 15. Yet Onyeani had never reported any of this income to the IRS. At the hearing, Onyeani explained that this was *projected* income and not actual income; but not only is there no reference to "projected" income on the application, he submitted purported *past* paystubs for January 2013. During closing arguments, his attorney offered another explanation when he admitted that Onyeani did not tell the truth on Wells Fargo's loan application. But Onyeani is between a rock and a hard place, because neither version of the events helps him. If the Wells Fargo loan documents were accurate, then Onyeani had income that he never reported to the IRS, supporting the IRS's conclusion that Onyeani would conceal future income. And if it was true that Onyeani lied on the loan application (which is likely if Calgary, Inc. never got off the ground due to regulatory problems), then the admission undercuts his credibility. Not only did he misrepresent his $150,000 salary, he also *forged* past paychecks on his loan application. The false documents would also support a broader plan to perpetuate an illegitimate business, again giving the IRS reason to believe that Onyeani was concealing fraudulent proceeds in a sham business deal. Either way, the Wells Fargo documents hurt Onyeani.

In sum, it was reasonable for the IRS to conclude that Onyeani appeared to be conducting a non-bona fide oil business, that he had fraudulently obtained investor and buyer money, and that he was attempting to transfer money outside of the United States or otherwise conceal it. To be clear, the Court is *not* concluding that Onyeani *actually* did any of these things. Perhaps a factfinder will ultimately agree with Onyeani that the evidence merely shows that he was an inexperienced entrepreneur who made innocent mistakes. But at this stage, there is enough evidence to show that there was the *appearance* of unlawful activity, based on the suspect corporate documents, irregular banking activity, and attempted overseas transfer of $300,000 for which there are no documents to substantiate. This evidence satisfies the low evidentiary standard for reasonableness.

Onyeani makes three main arguments that the IRS's determination was unreasonable: (1) the IRS should not have taxed the entire $800,000, because some of the funds (in particular, the $300,000 owed to Supply Source) were business expenses and not income; (2) the IRS should have assessed *corporate* taxes rather than individual income taxes; and (3) the levy was unreasonable because it was captioned incorrectly. None of these arguments carry the day.

The first two arguments are rejected because the objective evidence shows that Onyeani's crude-oil business did not appear to be bona fide, as discussed in detail above. As a result, it was reasonable for the IRS to tax the entire $800,000 rather than only $500,000, because it did not appear that the $300,000 attempted transfer to Supply Source was really a legitimate business expense. As explained

above, there was no contract with Supply Source, no communications about this transaction, nor any other evidence to corroborate Onyeani's version of this transfer. Under these facts, it was reasonable for the IRS to believe that Onyeani was not transferring the $300,000 for any legitimate transaction, but rather to send it abroad, use it personally, conceal it, or otherwise dispose of it. In other words, it appeared that Onyeani was treating the entire $800,000 as personal income available to him.

For the same reason—that is, that Onyeani's crude-oil business did not appear genuine—it was reasonable for the IRS to treat all of the money as individual income, rather than as corporate income. Onyeani's mere adherence to corporate formalities—such as registering his businesses in the state, filing an EIN with the IRS, and opening up business bank accounts—does not mean that these business entities were actually legitimate, when weighed against of all the evidence to the contrary. Thus, it was reasonable for the IRS to conclude that the income really belonged to Onyeani, who seemed to be using his company as fronts for his own activities.

As to Onyeani's final argument about the termination levy, the IRS has also met its burden to show that the levy—as distinct from the termination assessment—was reasonable. Under § 6331, the IRS is permitted to issue a levy on the taxpayer's property to satisfy an assessment. 26 U.S.C. § 6331(a). The IRS bears the burden of demonstrating that the levy was reasonable, and the standards are the same as those for a termination assessment. *Wellek*, 324 F. Supp. 2d at 912; 26

U.S.C. § 7249(b)(3)(B) ("[T]he court shall determine … whether or not the levy … is reasonable under the circumstances."). Because the Court has already determined that the tax assessment was reasonable, *see supra,* the levy—which simply allows the IRS to enforce the assessment—is also reasonable. Onyeani's main disagreement is that the levy incorrectly referred to "Ugorji Onyeani as the alter ego of American Hope Petroleum and Energy." Notice of Levy at 2. According to Onyeani, if the IRS's theory is that Onyeani's business entities were actually fronts for his *individually* fraudulent activities, then the caption should have been the reverse: American Hope Petroleum and Energy as the alter ego of Ugorji Onyeani. But even if the levy was titled incorrectly, it targets the right funds—money from Onyeani's personal and business bank accounts—because the IRS reasonably believed his personal and entity assets were one and the same. Regardless of how it is titled, the levy accomplishes the correct result and is reasonable.

### B. Appropriateness of the Amount Assessed

The taxpayer bears the burden on the second question: whether the amount assessed was appropriate under the circumstances. 26 U.S.C. § 7249(g)(2); *Hiley*, 807 F.2d at 627. The taxpayer must "show that the method of calculating the assessment amount is fatally defective, irrational, arbitrary, or unsupported. *Wellek*, 324 F. Supp. 2d at 914 (citations omitted). For this question, the focus is on the method used to determine the tax liability. *Thompson*, 2010 WL 3893806, at *6. "This review just determines if the assessment was done properly, and has no

bearing on the ultimate tax liability." *Id.* (citing *United States v. Doyle*, 482 F. Supp. 1227, 1230 (E.D. Wisc. 1980)).

In Onyeani's case, the total tax assessment is $288,546 with $497.08 in interest,[5] for a total of $289,043.08. Notice of Levy at 2. The IRS determined this amount by adding up the amounts in Onyeani's three BMO Harris accounts, totaling $802,083, taking a standard deduction of $6,200, and applying the married-filing-separately tax rates. Notice of Assessment at 3. This calculation was reasonable because it uses the standard method of calculating personal income tax. Applying a standard deduction (instead of itemized deductions) was appropriate because Onyeani and Paulino had never itemized on their prior returns. 2011 Tax Return; 2012 Tax Return; 2013 Tax Return. And applying the married-filing-separately (as opposed to married-filing-jointly) deduction and tax rates was also appropriate because Paulino filed a separate return for 2014, the most recent tax year. 2014 Tax Return (Paulino). And it was reasonable to assess the entire $802,083 as 2015 income, because Onyeani acquired all the funds in that year.

Although Onyeani takes issue with the IRS's failure to include a personal exemption, which would have deducted $4,000 from the total taxable income,[6] Kron testified that the exemption is not automatic—a taxpayer would have to claim it. True, Onyeani is probably entitled to this exemption because it is unlikely that

---

[5]Onyeani does not challenge the IRS's interest assessment of $497.08. It is possible that adding interest was a mistake, because the 2015 tax was assessed before the end of the tax year, and thus before interest on late payments could accrue. But Onyeani has forfeited this argument because it was his burden to challenge the amount of the assessment, which he did not do.

[6]*See* IRS Publication, Personal Exemptions and Dependents, available at https://www.irs.gov/publications/p17/ch03.html#en_US_2015_publink1000170847.

someone else would claim him as a dependent; he also claimed the exemption on his prior tax returns. 2011 Tax Return; 2012 Tax Return; 2013 Tax Return. But the failure to include this exemption did not make the determination "fatally defective, irrational, arbitrary, or unsupported." *Wellek*, 324 F. Supp. 2d at 914 (citations omitted). At most, applying the exemption would have reduced the tax liability by about $1,600,[7] constituting a tiny fraction of the total assessment of $289,043.08. Because the IRS's calculation method was appropriate, Onyeani must challenge the specifics of his ultimate tax liability in a different proceeding.

## IV. Conclusion

For the reasons described above, the IRS's termination assessment and levy against Onyeani were reasonable and the amount assessed was appropriate. Onyeani's petition for review [R. 1] is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 3, 2016

---

[7]For 2015, the married filing separately tax rate was 39.6% for any amount over $232,425; 39.6% of $4,000 is $1,584. *See* IRS Publication, Additional Material, available at https://www.irs.gov/publications/p17/ar02.html.